IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAYSAROH                                     :
c/o 1100 Wayne Avenue                        :
Suite 900                                    :
Silver Spring, MD 20910                      :
                                             :         Civil Action No. _____
         Plaintiff,                          :
                                             :
     v.                                      :
                                             :
AMERICAN ARAB COMMUNICATIONS :
& TRANSLATIONS CENTER, LLC                   :
t/a/ ZENOBIA LOUNGE                          :
1025 31st Street, NW,                        :
Washington, D.C. 20007                       :
                                             :
FARAH ATASSI                                 :
2111 Arrowleaf Drive,                        :
Vienna, VA 22182-5192                        :
                                             :
CHARIF KHANJI                                :
2111 Arrowleaf Drive,                        :
Vienna, VA 22182-5192                        :
                                             :
         and                                 :
                                             :
AHMAD ATTASI                                 :
2111 Arrowleaf Drive,                        :
Vienna, VA 22182-5192                        :
                                             :
         Defendants.                         :
_____           :

Maysaroh, by through undersigned counsel, alleges as follows:

**PRELIMINARY STATEMENT**

1.  Defendants trafficked Plaintiff Maysaroh (hereinafter "Maysaroh") into the United States

    for the purpose of forced labor. The Defendants, in collaboration with labor recruiter

Nura Ziadeh,[1] lured Maysaroh to the United States from Indonesia with false promises of employment as a household maid with a "General Muhammed Al-Karsi" with the expectation of reasonable working conditions and wages. Once in the United States, Defendants effectively imprisoned Maysaroh in their home and subjected her to slavery-like practices, involuntary servitude, and forced labor as a domestic servant. These acts were in violation of federal and state law.

2. Immediately upon Maysaroh's arrival in the United States, the Defendants confiscated her passport and isolated Maysaroh from the outside world. The Defendants exploited Maysaroh's lack of English skills and knowledge of the United States, complete isolation from friends and family, and fear of not being able to pay off the debts she incurred from high recruitment costs to secure work in the United States, in order to manipulate and control her. Defendants forbade Maysaroh from contacting or interacting with persons outside their home. Members of the Defendants' household frightened Maysaroh with warnings that she could be raped or shot if she trusted persons outside their home in the United States. Defendants also knew that Maysaroh suffered from repeated unwanted physical touching and sexual harassment by a member of their household, yet they did nothing to stop said abuse.

3. From June 2011 through January 2012, Defendants Farah Atassi and Charif Khanji forced Maysaroh to work as a domestic servant and nanny in their home in Vienna, Virginia. During this time the Defendants also compelled Maysaroh to perform work for Defendants' business, the American Arab Communications & Translations Center, LLC,

---

[1] On March 18, 2013, Ms. Ziadeh plead guilty to five criminal counts which charged her with violations of 8 U.S.C. §1324(a)(1)(A)(iii) and Title 18 U.S. Code, Section 2, Harboring Illegal Aliens. Ms. Ziadeh is awaiting sentencing as of the date of filing this Complaint.

t/a/ Zenobia Lounge, in the District of Columbia.  Defendants forced Maysaroh to work approximately seventeen hours per day, seven days a week.  She received no breaks for vacation, sick leave, or personal time.  During this entire period, Defendants never paid Maysaroh.

4.  Defendants are influential business owners in the Washington, D.C. metropolitan area. Defendant Farah Atassi is a political commentator with connections to the media, politicians, heads of state, and other business owners in the United States and throughout the Middle East.  Members of the Defendants' household repeatedly made Maysaroh aware of the Defendants' political connections, increasing her fear of Defendants and her susceptibility to their daily demands on her.

5.  Maysaroh brings this civil action against Defendants for damages from having been trafficked by Defendants into the United States for forced labor, in violation of the Trafficking Victims Protection Act 18 U.S.C. § 1590 ("TVPA") and other authorities. She also seeks damages for Defendants' failure to pay her minimum wages and overtime wages in violation of the Fair Labor Standards Act 29 U.S.C. § 201 et seq., ("FLSA") and the District of Columbia Minimum Wage Law, D.C. Code § 32-1001 et seq. ("DCMWL"), as well as damages for false imprisonment.

## JURISDICTION AND VENUE

6.  Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1367 and the Fair Labor Standards Act, 29 U.S.C. § 216(b).

7.  Venue is proper, as the individual Defendants' business, the American Arab Communications & Translations Center, LLC, t/a/ Zenobia Lounge, for which Maysaroh

worked, is located within the District of Columbia, and relevant actions took place in the District of Columbia.

## PARTIES AND JURISDICTION

8. Plaintiff Maysaroh ("Plaintiff") is an adult resident of the State of Maryland.

9. Defendant American Arab Communications & Translations Center, LLC, t/a/ Zenobia Lounge (hereinafter referred to as "Zenobia Lounge") is licensed to conduct business in the District of Columbia, and is located in and conducts business in the District of Columbia.

10. Defendant Farah Atassi (last name also spelled as "Al-Atassi") is an adult resident of the Commonwealth of Virginia.

11. Defendant Charif Khanji is an adult resident of the Commonwealth of Virginia.

12. Defendants Farah Atassi and Charif Khanji are married.

13. Defendant Ahmad Atassi is an adult resident of the Commonwealth of Virginia and is the brother of Defendant Farah Atassi.

14. Defendant Farah Atassi is an owner and/or exercises control of Zenobia Lounge, and she conducts business in the District of Columbia.

15. Defendant Charif Khanji is an owner and/or exercises control of Zenobia Lounge, and he conducts business in the District of Columbia.

16. Defendant Ahmad Atassi is an owner and/or exercises control of Zenobia Lounge, and he conducts business in the District of Columbia.

17. Farah Atassi is an employer within the meaning of 29 U.S.C. § 203(d).

18. Farah Atassi is an employer within the meaning of D.C. Code § 32-1002(3).

19. Charif Khanji is an employer within the meaning of 29 U.S.C. § 203(d).

20. Charif Khanji is an employer within the meaning of D.C. Code § 32-1002(3).

21. Ahmad Atassi is an employer within the meaning of 29 U.S.C. §203(d).

22. Ahmad Atassi is an employer within the meaning of D.C. Code § 32-1002(3).

23. Zenobia Lounge is an employer within the meaning of 29 U.S.C. § 203(d).

24. Zenobia Lounge is an employer within the meaning of D.C. Code § 32-1002(3).

25. One or more Defendants employed Maysaroh within the meaning of 29 U.S.C. ,

§ 203(g) and D.C. Code § 32-1002(1).

26. During Maysaroh's employment with Defendants, Plaintiff was engaged in interstate
commerce and in the production and sale of goods that have moved through interstate
commerce.

27. At all times pertinent to this action, Defendants were the joint employers of Plaintiff,
within the meaning of 29 C.F.R. § 791.2.

## FACTUAL ALLEGATIONS

### Maysaroh's Early Relationship with the Defendants and Their Labor Recruiter

28. Maysaroh is a thirty-seven year old woman originally from South Sumatra, Indonesia.
Maysaroh's first language is Indonesian. Maysaroh also speaks some Arabic, and this is
the language she used to communicate with the Defendants. Maysaroh completed
primary school in Indonesia through the sixth grade and has a very limited understanding
of English. Maysaroh is married and has a twelve year-old son; both her husband and
son reside in Indonesia. Maysaroh does not have any close family members currently
residing in the United States. Maysaroh's only other international work experience prior
to coming to the United States was a two- year contract (approximately 1996 to 1998) in
Saudi Arabia where she worked as a domestic servant for other employers.

29. In approximately late 2009 or early 2010, Maysaroh was unemployed and living in Indonesia. She received information from a distant relative, who was working in America, that she may be able to find employment in the United States as a maid through a labor recruiter, Nura Ziadeh (hereinafter "Mrs. Ziadeh").[2] Through further telephone conversations with this relative, Maysaroh received information that Mrs. Ziadeh had helped many Indonesian women—including persons from villages in Maysaroh's area—find employment as maids in the United States, and that these positions paid approximately $1000 per month.

30. Upon information and belief that Mrs. Ziadeh's labor recruitment business was legitimate and that she could find reasonable employment in the United States, Maysaroh made approximately five trips during 2010 from her home in South Sumatra to Jakarta to process paperwork with Mrs. Ziadeh's agency to apply to work in the United States. These trips from Sumatra to Jakarta cost Maysaroh a considerable amount of money, which she procured through bank loans and through the sale of family assets, such as her husband's motorbike.

31. In addition, Maysaroh was required to pay a 15 million Rupiah (approximately $1,644) down payment before Mrs. Ziadeh began to process her application for work in the United States.

32. In total, Maysaroh accumulated a debt of 30 million Rupiah (approximately $3000) prior to her departure to the United States, a sum equal to two-and-a-half times Maysaroh's household annual income at that time.

---

[2] Upon information and belief, the woman identified to Maysaroh is Nura Ziadeh. On March 18, 2013, Ms. Ziadeh plead guilty to five criminal counts which charged her with violations of 8 U.S.C. §1324(a)(1)(A)(iii) and Title 18 U.S. Code, Section 2, Harboring Illegal Aliens. Ms. Ziadeh is awaiting sentencing as of the date of filing this Complaint.

33. From approximately August 1, 2010, to September 9, 2010, Maysaroh worked for a one-month period for Mrs. Ziadeh's family in Jakarta. Mrs. Ziadeh told Maysaroh words to the extent of, "this will be a trial period before you go to work in the United States." During this time, Mrs. Ziadeh assured Maysaroh that her workload in the United States would be lighter and generally better than what Maysaroh experienced previously as a domestic servant in Saudi Arabia.

34. In approximately May 2011, Bobby Ziadeh (hereinafter "Bobby"), the son of Mrs. Ziadeh and an agent of Mrs. Ziadeh's labor recruitment agency, informed Maysaroh that the agency had identified a U.S. employer for her.

35. Bobby informed Maysaroh that, pursuant to an employment contract, she (Maysaroh) would receive wages of $1,000 per month for the work she would perform in the United States. Bobby further informed Maysaroh that her employer-sponsor was a wealthy, military General, and that she would receive a good salary.

36. On the day of Maysaroh's visa interview at the U.S. Consulate in Jakarta, Indonesia, Bobby met Maysaroh as she waited in line for her interview. During this time, Bobby gave Maysaroh a document, which he explained was her employment contract, one of the documents required for her A-3 visa application. Maysaroh noted that the contract was to work for a certain "General Muhammed Al-Karsi" in the United States. Maysaroh further noted that the contract stated that she would be paid $1,000 per month in wages for the work she performed in the United States. Maysaroh submitted this contract to the U.S. Consulate along with her visa application materials. She was not able to make a copy of the document before submitting it to the Consulate. Maysaroh never received her own copy of the contract, despite repeated attempts to get a copy from Bobby.

37. During the time that Maysaroh and Bobby were waiting in line at the U.S. Consulate in Jakarta, Bobby received a phone call from Defendant Farah Atassi on his cell phone. As Bobby answered the phone, he indicated to Maysaroh that the person on the phone was a lady in the United States connected to her employer. Defendant Farah Atassi and Bobby conversed in English; thus, Maysaroh did not understand the majority of their conversation. During this call, Bobby paused briefly to ask Maysaroh (in Indonesian) if she spoke English, to which Maysaroh replied (in Indonesian) that she did not but stated that she speaks some Arabic. To the best of Maysaroh's knowledge, Bobby conveyed her answer to Defendant Farah Atassi and quickly ended the phone call.

38. In approximately May 2011, the U.S. Consulate in Jakarta issued Maysaroh her U.S. visa. Maysaroh was issued an A-3 nonimmigrant visa with an annotation stating something to the effect of "Personal or Domestic Employee of General Muhammed Al-Karsi." Defendant Farah Atassi later took Maysaroh's passport; thus, Maysaroh cannot confirm the exact wording of the annotation..

39. On approximately June 5, 2011, Bobby accompanied Maysaroh to the Soekarno Hatta International Airport in Jakarta, Indonesia to assist her with checking-in for her flight to the United States. While at the airport, Defendant Farah Atassi called Bobby on his cell phone. This time, she asked to speak with Maysaroh. Bobby handed the phone to Maysaroh and indicated that it was the same lady who had called before. Maysaroh took the phone and asked (in Arabic) words to the effect of, "Are you the lady of the house?" Defendant Farah Atassi answered affirmatively (in Arabic), but did not introduce herself further. Defendant Farah Atassi asked Maysaroh to describe what she was wearing so that Defendant Farah Atassi could identify her at the airport in the United States.

40. On approximately June 5, 2011, Maysaroh debarked from Jakarta, Indonesia to the United States.

**Defendants Deceived Maysaroh into Working for Them in the United States**

41. On June 7, 2011, Maysaroh arrived at Dulles International Airport near Sterling, Virginia.

42. Defendant Farah Atassi and an individual whom Defendant Farah Atassi introduced to Maysaroh as "General Muhammed Al-Karsi" greeted Maysaroh at the airport. Once Maysaroh retrieved her luggage, Defendant Farah Atassi and General Muhammed Al-Karsi escorted Maysaroh to a car parked in the airport parking lot.

43. Once inside the car, but still in the parking lot at the airport, Defendant Farah Atassi immediately confiscated Maysaroh's passport.

44. Defendant Farah Atassi and General Muhammed Al-Karsi drove Maysaroh to an unknown location approximately one-hour's drive from Dulles Airport. Farah Atassi then instructed Maysaroh to remove her luggage from the car in which they had been riding and to place it in a large black car parked at this location – a car that Defendant Farah Atassi identified as her own. After Maysaroh moved her luggage, Defendant Farah Atassi instructed Maysaroh to wait inside the new car. Defendant Farah Atassi and General Muhammed Al-Karsi spoke briefly outside of the car. Maysaroh was not able to follow their conversation from inside the car. General Muhammed Al-Karsi got into the first car and drove away. Defendant Farah Atassi got into the second car with Maysaroh and drove approximately one hour to Defendant Farah Atassi's residence in Vienna, Virginia.

45. Maysaroh arrived at Defendants Farah Atassi and Charif Khanji's residence at 2111 Arrowleaf Drive, Vienna, Virginia 22182-5192, on June 7, 2011. From that day forward,

Maysaroh was largely confined to this house until she managed to escape from the Defendants' residence in January of 2012.

46. Over the next few weeks, Maysaroh realized that she would not be working for the household of General Muhammed Al-Karsi as she had been promised, but for the Defendants' household. Thus, Maysaroh was surprised by the identity of her employer and the extent of her duties. From June 2011 until January 2012, Defendants forced Maysaroh to work for Defendants Zenobia Lounge, Farah Atassi, Chaif Khanji, Ahmad Atassi, and their extended family.

47. When Maysaroh first arrived, Defendants Farah Atassi and Charif Khanji's residence consisted of three adults (the named individual Defendants) and two children. A few weeks after Maysaroh started working for the Defendants, Defendants Farah Atassi and Ahmad Atassi's parents arrived from Syria. Maysaroh referred to these new members of the household as "Grandmother" Atassi and "Grandfather" Atassi. Grandmother and Grandfather Atassi resided at the Defendants' house in Virginia for the remainder of Maysaroh's time there, and Maysaroh also performed work for them.

48. From approximately August 2011 until January 2012, Defendants forced Maysaroh to perform household tasks daily, and respond to the various personal care demands of five adults and two children (in addition to performing tasks for the Defendant's business in Washington, DC). The adults in the household were: Defendant Farah Atassi, Defendant Charif Khanji, Defendant Ahmad Atassi and Defendant Farah Atassi's parents (hereinafter, "Grandmother" and "Grandfather" Atassi). The children in the household were: Defendant Farah Atassi and Defendant Charif Khanji's children, Hadi Charif Khanji and Aya Charif Khanji, ages 11 and 10 at that time.

49. Maysaroh never saw General Muhammed Al-Karsi after June 7, 2011; and, to the best of her knowledge, she never performed any tasks for him.

## The Defendants Isolated Maysaroh and Effectively Imprisoned Her in Their Home

50. Upon arrival at the residence of Farah Atassi and Charif Khanji on June 7, 2011, Defendant Farah Atassi immediately confiscated Maysaroh's Indonesian identity card, departure card from the Jakarta airport, personal address book, over-the-counter headache medication, and hand bag, along with all of its contents.

51. Later on June 7, 2011, Defendant Farah Atassi forced Maysaroh to go through her address book and identify each of the persons listed in the book, such as Maysaroh's husband, second cousin (who was living in New Jersey at the time), and other friends and relatives in Indonesia. As Maysaroh identified each person, Defendant Farah Atassi made annotations in the margins of Maysaroh's address book. After Defendant Farah Atassi finished asking questions, she took Maysaroh's address book away again.

52. During Maysaroh's employment with Defendants, Defendants prohibited Maysaroh from having almost any contact with individuals outside of Defendants' family.

53. At the beginning of Maysaroh's employment, Defendants allowed Maysaroh to walk outside to the mailbox and to accompany Defendants' children to the school bus approximately two blocks down the street. However, after a short period of time, Defendants forbid Maysaroh from doing these tasks because these tasks allowed her to go outside without their direct supervision. For the remainder of her employment with Defendants, Maysaroh was not allowed to leave Defendants' house unless accompanied or monitored closely by an adult member of the Defendants' household. For example, on a few occasions, Maysaroh was instructed to fetch the mail, during which time a member

of the household would monitor her movements closely through the front windows of the house until she returned inside with the mail. The only other times Maysaroh was only allowed to step outside the Defendants' residence was when she was instructed to accompany the Defendants on an errand, or when the Defendants transported her to Zenobia Lounge in Washington, DC to clean.

54. The Defendants' house had a security system that Maysaroh did not know how to operate. Defendants never instructed Maysaroh how to operate the system. Maysaroh understood, however, that if she attempted to open a door without deactivating the system first, an alarm would sound.

55. Defendants did not allow Maysaroh to make telephone calls without their direct supervision. Defendants permitted Maysaroh to make only four telephone calls to her husband and son, during which Defendants permitted her to speak with her family for only approximately five minutes each call. Two of these phone calls were solely for the purpose of communicating to her husband that a wire transfer had been sent by Defendant Farah Atassi. Defendants monitored these four calls by sitting nearby, listening to and watching Maysaroh as she spoke to her family. Defendants interrupted and ended Maysaroh's phone calls to her family after approximately five minutes, claiming that she was wasting time and/or money.

56. Defendants did not allow Maysaroh to make contact with others outside their home who spoke her native language of Indonesian. On one occasion during Maysaroh's employment, Maysaroh accompanied Defendant Farah Atassi and Grandmother Atassi to a shopping mall. When Maysaroh encountered Indonesian-speaking individuals at the

mall, Grandmother Atassi physically pulled Maysaroh by the arm and did not allow her to speak to them.

57. On approximately December 31, 2011, Defendants Farah Atassi, Charif Khanji, and their two children travelled to Florida and left Maysaroh with Grandfather Atassi and Grandmother Atassi at their residence in Virginia. During this time, Maysaroh searched the residence and discovered her departure card, Indonesian identity card, and personal address book. Maysaroh copied several phone numbers from the address book onto another piece of paper, and then returned the address book to the location where she found it. Maysaroh reclaimed her Indonesian identity card and departure card. Later, while the Defendants were still in Florida, Maysaroh attempted to call her second cousin who was living in New Jersey at that time.

58. When Defendants arrived back at the residence, they learned that Maysaroh had made a telephone call without their supervision and became very angry. Because she was frightened, at first Maysaroh denied making the call, but Defendant Farah Atassi became further enraged. Defendant Farah Atassi took a copy of the Al'Quran from a nearby bookshelf and insisted that Maysaroh swear over it. Not wanting to commit blasphemy, Maysaroh admitted to using the phone.

**The Defendants Subjected Maysaroh to Forced Labor**

59. Having effectively isolated Maysaroh and imprisoned her in their home, Defendants forced Maysaroh to perform numerous household tasks for their family. These tasks included preparing food and performing other tasks for and at their business Zenobia Lounge. Seven days a week, from approximately 7:00 a.m. to 12:00 a.m., Defendants forced Maysaroh to perform household tasks including cleaning their three-story, 6-

bedroom and 5-bathroom home. In addition to cleaning bedrooms and bathrooms, Maysaroh was forced to clean the kitchen, in-house office and living spaces; sort, wash, iron, and fold clothing for the Defendants and their extended family; prepare all the meals and snacks for the Defendants and their extended family; wash dishes; feed and tend to the Defendants pet rabbits and cat; vacuum and wipe down the interior of the Defendants' cars; and, generally arrange and tidy the interior of the whole three-story house. Maysaroh was also forced to provide body massages to Defendant Farah Atassi nearly every evening for an hour or more.

60. Maysaroh's daily work schedule was approximately as follows: Defendants forced Maysaroh to perform household chores from 7:00 a.m. to 9:30 or 10:00 a.m. Maysaroh's morning chores included preparing breakfast for Farah Atassi and Charif Khanji's children before they departed for school at 8:30 a.m. On weekdays during the school year, Maysaroh helped the children, Hadi and Aya, get ready to depart for school at 8:30 a.m., and after the children left for school, she prepared breakfast for the five adults in the household.

61. Maysaroh performed other household tasks between approximately 9:30 a.m. and 9:00 p.m., including cleaning the interior of the residence, doing laundry, ironing, cooking for all seven members of the household, cleaning up after each meal, and cleaning the interior of the garage and interior of the cars.

62. Maysaroh concluded the household chores at approximately 9:00 p.m. or 9:30 p.m.

63. Defendant Farah Atassi required Maysaroh to provide her with a massage at 9:30 p.m. or 10:00 p.m. for an hour or more on most evenings. Defendant Farah Atassi only excused

Maysaroh from providing her with a massage when Maysaroh was menstruating and was too tired and weak to provide a massage.

64. Zenobia Lounge is located at 1025 31st Street, NW, Washington, D.C. 20007.

65. Defendant Farah Atassi owns and operates Zenobia Lounge.

66. Defendant Ahmad Atassi operates Zenobia Lounge.

67. At Defendants' instruction, on approximately fifteen separate occasions in July 2011, prior to the beginning of Ramadan (which lasted from approximately August 1 to August 31, 2011), Maysaroh spent between two and three hours preparing food for Zenobia Lounge.  Maysaroh was forced to prepare this food at Defendants' residence in Vienna, Virginia.  Defendants later transported the food to Zenobia Lounge in Washington, D.C. for sale and consumption.

68. At Defendants' instruction, on two or three occasions during Ramadan in August 2011, Maysaroh prepared food for Zenobia Lounge for two to three hours at a time.  Maysaroh was forced to prepare the food at the residence in Vienna, Virginia, which was then transported by the Defendants to Zenobia Lounge in Washington, D.C. for sale and consumption.

69. At Defendant's instruction, on approximately three occasions after Ramadan in September 2011, Defendants brought Maysaroh from Virginia into Washington, D.C. and ordered Maysaroh to clean Zenobia Lounge in Washington D.C.

70. At Defendant's instruction, Maysaroh cleaned the entire restaurant, the upstairs bathrooms, and Farah Atassi's office at Zenobia Lounge.

71. Defendant Farah Atassi drove Maysaroh to Zenobia Lounge on these occasions.

72. On several of these occasions, Defendant Farah Atassi's mother, "Grandmother Atassi," supervised Maysaroh's work at Zenobia Lounge and ensured that Maysaroh did not leave the restaurant.

73. On numerous other occasions between June 2011 and January 2012, Defendants forced Maysaroh to clean portions of the Zenobia Lounge in Washington D.C. Defendant Farah Atassi transported her from Virginia to the District of Columbia restaurant and ordered her to complete tasks such dusting the shelves, and cleaning Defendants' Farah Atassi and Ahmad Atassi's second floor office.

74. When Defendant Farah Atassi took Maysaroh from Virginia to Zenobia Lounge during business hours, Defendants confined her to cleaning the upstairs office. She was not allowed to be in the first floor restaurant area near any of the customers.

**Defendants Threatened and Mistreated Maysaroh**

75. In approximately September 2011, during a brief conversation between Maysaroh and Grandfather Atassi, Grandfather Atassi told Maysaroh that the United States is full of bad people and warned her not to trust persons outside the Defendants' home. Grandfather Atassi further threatened Maysaroh that that if she attempted to leave the Defendants' home, she could end up getting shot or raped.

76. Grandfather Atassi often bragged to Maysaroh about all the important people that his daughter, Defendant Farah Atassi, knew and worked with, including heads of State and other dignitaries. Whenever Defendant Farah Atassi was interviewed on TV or her name appeared in the newspaper, Grandfather Atassi called Maysaroh away from her work and insisted that she watch Defendant Farah Atassi on TV or look at the news article. The more Maysaroh heard about Defendant Farah Atassi's connections, the more Maysaroh

feared her. Maysaroh feared that if she tried to escape, Defendant Farah Atassi would use her connections with powerful people to find her again, or to hurt her and her family.

77. Defendants housed Maysaroh in a tiny room in their basement. Upon information and belief, the room is designed for use as a storage area or utility closet, not a bedroom. The room did not have any windows, source of heat, air conditioning or ventilation, and the floor space was barely larger than the twin mattress Maysaroh slept on. Maysaroh could not lock her bedroom door. During the winter, the room became uncomfortably cold. Due to the lack of ventilation, Maysaroh frequently had to leave the door ajar such that fresh air or heat could come in, further eroding her extremely limited personal space and privacy.

78. Grandfather Atassi frequently followed Maysaroh as she walked around the Defendants' house and tried to hug and kiss her when he could corner her alone for a few minutes. These actions made Maysaroh extremely uncomfortable. Grandfather Atassi taunted Maysaroh regarding her state of financial dependence, offering her money in exchange for her acquiescence to his sexual advances. Maysaroh refused all of his advances and money, but Grandfather Atassi persisted as long as she remained in the Defendants' home. At times, Grandfather Atassi entered Maysaroh's bedroom at night, when everyone else was sleeping. He stroked her body, pressed down on her, and kissed her by force. His actions greatly frightened and offended Maysaroh. Maysaroh reported Grandfather Atassi's behavior to Defendant Charif Khanji, but he did nothing to try to stop the behavior from continuing. Maysaroh lived in constant fear of Grandfather Atassi, and this fear often interfered with her ability to rest or sleep.

79. On multiple occasions while Maysaroh remained under their control, Defendants failed to provide appropriate medical care for Maysaroh. During her forced employment with the Defendants, Maysaroh experienced debilitating physical, emotional and psychological pain. Maysaroh suffered severe headaches, vomiting, and often cried herself to sleep at night.

80. When Maysaroh arrived in the United States on June 7, 2011, Defendant Farah Atassi confiscated Maysaroh's over-the-counter pain medications that Maysaroh brought with her from Indonesia, and never replaced them. As a result, Maysaroh frequently suffered from severe headaches.

81. During Ramadan 2011 (approximately August 2011), Maysaroh vomited two times in a row. Maysaroh reported her illness to Defendant Farah Atassi. Defendant Farah Atassi never sought any medical attention for Maysaroh. On this occasion, Defendant Atassi allowed Maysaroh to rest for a few hours, before instructing her to resume her daily cleaning duties.

82. On a date uncertain, Defendant Charif Khanji noticed that Maysaroh suffered from poor eye sight. Maysaroh explained to the Defendants that her eyeglasses broke just before she departed from Indonesia and that she needed to replace them. A few days later, Grandmother Atassi gave Maysaroh two pairs of glasses that she said were purchased from a CVS drug store. The glasses were not the right prescription and made Maysaroh's eyesight worse. Grandmother Atassi insisted that the glasses were the right prescription and that Maysaroh should wear them. Maysaroh tried the glasses again, but she could not see with them on, so she gave them to Defendant Farah Atassi. For the remainder of the time that Maysaroh was detained in the Defendants' household, they did not allow her to

18

see an eye doctor to have her eyes checked.  The lack of proper eyeglasses exacerbated

Maysaroh's frequent headaches.

83. Defendants forced Maysaroh to work every day, including holidays and weekends.

Defendants never gave her a full day off for vacation, sickness, religious observance or

personal time.  The Defendants allowed Maysaroh to take brief breaks to pray (as a

Muslim, Maysaroh's faith requires that she pray five times in a 24-hour period), but these

breaks were limited to approximately five minutes each.  If Maysaroh took longer to

pray, Grandmother Atassi came downstairs to Maysaroh's room and paced in front of her

door until she was done praying.  When Maysaroh came out of the room, Grandmother

Atassi chastised her for taking too long.

84. Maysaroh's workload did not permit her time to eat regular meals.  For breakfast, she ate

a piece of bread with a cup of tea around 10:00 a.m. or 11:00 a.m., after everyone else in

the household had eaten breakfast and left for school or work.  For lunch, Maysaroh ate

*Indomie* (a dish similar to Ramen noodles) approximately two or three times a week.  On

other days she skipped lunch, because she too busy working and did not feel that she

could take a break to prepare lunch for herself.  Maysaroh ate dinner in the kitchen

around 7:00 p.m. or 7:30 p.m., after the Defendants had finished their dinner.  For dinner,

Maysaroh was only allowed to eat leftovers from the Defendants' meal.  Sometimes there

were leftovers that the Defendants instructed Maysaroh not to eat, but to save for them

for the next day.  By the end of her forced employment with the Defendants, Maysaroh

had lost about 12 or 13 kilos (approximately 27 pounds)—approximately 20% of her

body weight.

**The Defendants Refused to Pay Maysaroh Her Promised Wages**

85. Defendants did not compensate Maysaroh for the work she performed for Defendants.

86. While Maysaroh was working for the Defendants, Defendant Farah Atassi wired $1000 to Maysaroh's family in Indonesia on two occasions, once in August 2011 and once in December 2011.

87. Defendants never paid Maysaroh for her work for Defendants.

88. Maysaroh did not agree to have money sent to her family in lieu of being paid the wages Defendants owed her.

89. After working for the Defendants for nearly 3 months without any pay, Maysaroh asked Defendant Farah Atassi when she would be paid. Soon thereafter, Defendant Farah Atassi gave Maysaroh a receipt from Western Union and instructed Maysaroh to call her husband in Indonesia and give him the pin number so that he could collect the money that Defendant Farah Atassi sent. Maysaroh asked how much money Defendant Farah Atassi sent so that she could confirm that her husband received the full amount. Defendant Farah Atassi replied that she sent $1000 and that Maysaroh was to be paid $300 per month in wages for her work for Defendants.

90. In late November 2011, Maysaroh pleaded for Defendant Farah Atassi to pay her $2000 because she needed to start paying off her bank loan in Indonesia as soon as possible. After several requests, Defendant Farah Atassi told Maysaroh that she would pay her $2000.

91. Defendants never paid Maysaroh the promised $2000.

92. In December 2011, Defendant Farah Atassi showed Maysaroh another Western Union slip and again instructed Maysaroh to call her husband and to tell him the pin number so that he could collect the money that Farah Atassi sent to Indonesia by Western Union.

Maysaroh asked Defendant Farah Atassi how much money she had wired. She replied, "$1000."

93. During this same conversation in December 2011, Maysaroh asked Defendant Farah Atassi why her salary was only $300 per month instead of the $1000 per month as written in the employment contract submitted on behalf of her U.S. visa application. Defendant Farah Atassi replied that the employment contract was just a formality.

94. At this time, Maysaroh also told Defendant Farah Atassi about the substantial debt she had accumulated in order to come to the United States of America to work. In response, Defendant Farah Atassi said that she did not know why Maysaroh would have any debt, and she claimed that she had sent money to Bobby Ziadeh to cover Maysaroh's pre-departure expenses. Maysaroh replied that Bobby Ziadeh never informed her that Defendant Farah Atassi sent money to cover her pre-departure expenses and reiterated that she should be paid in accordance with the employment contract.

95. Defendant Farah Atassi said that she would show Maysaroh her receipts from the money she sent to Bobby Ziadeh; however, Defendant Farah Atassi later said that she could not find the receipts and never showed Maysaroh any documentation to demonstrate that she had sent money to Bobby Ziadeh.

96. On one occasion, Maysaroh tried asking her husband if he had ever heard anything from Bobby Ziadeh about any money being sent to him by Defendant Farah Atassi on her behalf. However, Grandfather Atassi abruptly interrupted this conversation and forced Maysaroh to hang-up the phone before her husband could reply.

97. After each time Maysaroh spoke to her husband about the Western Union transfer, Defendant Farah Atassi took the Western Union receipt away from Maysaroh.

98. Defendants never gave Maysaroh any other receipt or pay stub.

99. Defendants did not provide Maysaroh with a bonus at any time.

100.     Defendants did not provide Maysaroh with any vacation time.

101.     From June 2011 to January 2012, while Maysaroh worked for and resided with Defendants, she never received any money or had access to any money.

102.     Defendant Farah Atassi had the power to hire and fire Maysaroh.

103.     Defendant Farah Atassi had the power to supervise Maysaroh's work.

104.     Defendant Farah Atassi had the power to determine Maysaroh's schedule.

105.     Defendant Farah Atassi had the power to determine Maysaroh's pay rate.

106.     Defendant Farah Atassi had the power to determine the method by which Maysaroh was paid and whether she would be paid at all.

107.     Defendants Farah Atassi did not require Maysaroh to record the time when she started work each day.

108.     Defendant Farah Atassi did not require Maysaroh to record the time when she ended work each day.

109.     Defendant Charif Khanji had the power to hire and fire Maysaroh.

110.     Defendant Charif Khanji had the power to supervise Maysaroh's work.

111.     Defendant Charif Khanji had the power to determine Maysaroh's schedule.

112.     Defendant Charif Khanji had the power to determine Maysaroh's pay rate.

113.     Defendant Charif Khanji had the power to determine the method by which Maysaroh was paid or whether she would be paid at all.

114.     Defendants Charif Khanji did not require Maysaroh to record the time when she started work each day.

115.   Defendant Charif Khanji did not require Maysaroh to record the time when she ended work each day.

116.   Defendant Ahmad Atassi had the power to hire and fire Maysaroh.

117.   Defendant Ahmad Atassi had the power to supervise Maysaroh's work.

118.   Defendant Ahmad Atassi had the power to determine Maysaroh's schedule.

119.   Defendant Ahmad Atassi had the power to determine Maysaroh's pay rate.

120.   Defendant Ahmad Atassi had the power to determine the method by which Maysaroh was paid or whether she would be paid at all.

121.   Defendants Ahmad Atassi did not require Maysaroh to record the time when she started work each day.

122.   Defendant Ahmad Atassi did not require Maysaroh to record the time when she ended work each day.

123.   Defendants did not maintain any records of the days and hours worked by Maysaroh.

124.   Pursuant to 29 C.F.R. § 516 and D.C. Code § 32-1008, Defendants are required to maintain a record of each hour worked, each day worked, and each week worked by any employee.

125.   The exact number of hours worked by Maysaroh will only be known through discovery.

126.   At all times relevant to this action, Defendants failed to comply with the notice and posting requirements of D.C. Code § 32-1009 and 29 C.F.R. § 516.4.

127.  On approximately January 8, 2012, Grandmother Atassi yelled at Maysaroh for failing to begin food preparation for an upcoming family wedding. Grandmother Atassi became very angry and threw things around the kitchen while shouting at Maysaroh.

128.  The next day (approximately January 9, 2012) Defendant Farah Atassi warned Maysaroh that she was lucky to have a job. During this conversation, Maysaroh requested to be allowed to return to her native Indonesia, to which Defendant Farah Atassi did not respond. Later the same day, Grandfather Atassi informed Maysaroh that she would not be allowed to return to Indonesia until approximately June 2013.

129.  The following day, approximately January 10, 2012, Maysaroh told Defendant Charif Khanji that she would like to go home. He did not respond.

130.  Feeling desperate and distraught about her situation, Maysaroh decided that she had to find a way to escape from the Defendants' home as soon as possible. She did not know where she would go or what she could do, but despite all of her fears of the unknown, she feared being trapped in perpetual slavery by the Defendants more.

131.  That evening, Maysaroh finally discovered how to disengage the home's security system so that she could open a door without the alarm sounding. Early the next morning (approximately January 11, 2012), Maysaroh woke before dawn and slipped out of the house while everyone else was sleeping. She took with her only a small duffle bag and a plastic grocery bag containing a few items. Once outside of the house, she immediately started to run in the direction that she believed led to a larger road.

132.  That same day, approximately January 11, 2012, a Malaysian family residing near the Defendants' home found Maysaroh outside. They provided her with a temporary

place to stay and assisted her in contacting members of the Indonesian diaspora community in Washington, DC who in turn helped her to find legal counsel.

133.     The actions taken by Defendants, elaborated in the preceding paragraphs, demonstrate that Defendants acted with evil motive, actual malice, deliberate violence or oppression, intent to injure or willful disregard for Maysaroh's rights, and Defendants' conduct was outrageous, grossly fraudulent and/or reckless towards the safety of Maysaroh.

## FIRST CLAIM FOR RELIEF

### Trafficking With Respect to Peonage, Slavery, Involuntary Servitude or Forced Labor in Violation of 18 U.S.C § 1590 (Against Defendants Farah Atassi and Charif Khanji)

134.     Maysaroh hereby incorporates the preceding paragraphs as if fully stated herein.

135.     Defendants Farah Atassi and Charif Khanji recruited Maysaroh to work for them; they transported her from Indonesia to the United States; harbored her in their home in order to obtain her forced, coerced, and involuntary labor and provide that forced, coerced, and involuntary labor to others including Defendants Ahmad Atassi and Zenobia Lounge, all in violation of 18 U.S.C. § 1590. Maysaroh is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

136.     Defendants Farah Atassi and Charif Khanji knowingly recruited Maysaroh from Indonesia via Nura Ziadeh's recruitment business. Defendants Farah Atassi and Charif Khanji knowingly obtained Maysaroh from General Muhammed Al-Karsi, Maysaroh's visa sponsor. Furthermore, Defendants Farah Atassi and Charif Khanji knowingly transported Maysaroh to, and harbored her in, their home all for the purpose of subjecting her to involuntary servitude, forced labor and enslavement.

137.    As a direct and proximate result of Defendants Farah Atassi and Charif Khanji's actions, Maysaroh suffered severe emotional distress, physical injuries, and economic losses.

138.    Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.

## SECOND CLAIM FOR RELIEF

### Forced Labor in Violation of 18 U.S.C § 1589
### (Against All Defendants)

139.    Maysaroh hereby incorporates the preceding paragraphs as if fully stated herein.

140.    Defendants Farah Atassi and Charif Khanji knowingly obtained Maysaroh's forced and coerced labor, and provided that forced and coerced labor to others, through a scheme, plan, and pattern of: enforced isolation; threats of serious harm; abuse of legal process; and in reckless disregard for serious financial harm being suffered by Maysaroh and her family, all in violation of 18 U.S.C. § 1589. Maysaroh is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

141.    Defendants confined Maysaroh to their home, did not allow her to leave the home without their direct supervision, and physically prevented her from making contact with anyone outside of Defendants' home in the United States. Defendants, through immediate family members who lived in their home and benefitted from Maysaroh's labor, threatened Maysaroh that if she trusted persons outside the home she could be raped or shot.

142.    Defendants knowingly obtained Maysaroh's labor services through a fraudulent employment contract which promised Maysaroh a salary of $1000/month.

143.     Defendants knowingly obtained Maysaroh's labor services from General Muhammed Al-Karsi, in deliberate violation of Maysaroh's lawfully acquired A-3 visa obtained through the sponsorship of General Muhammed Al-Karsi.

144.     Defendants are not foreign diplomats or emissaries working in the United States. Thus, they are not eligible to petition for a domestic servant through the A-3 visa program of the U.S. Department State. When General Muhammed Al-Karsi left Maysaroh with the Defendants, the Defendants obtained her as their own personal servant. Defendants abused U.S. immigration law and violated the terms of Maysaroh's lawfully acquired visa.

145.     Defendants knowingly benefitted from, or operated in reckless disregard of, the fact that Nura Ziadeh's labor recruitment venture engaged in providing and obtaining labor services from Maysaroh by means of serious financial harm to herself and her family. Maysaroh and her family suffered serious financial harm—the $3000 indebtedness described above—due to illegally high recruitment fees and excessive travel required by the recruiter between Sumatra and Jakarta to process her employment application. Defendant Farah Atassi acted with reckless disregard of the severe financial harm suffered by Maysaroh and her family in the recruitment process. Instead, Defendant Farah Atassi willfully exacerbated the ongoing, serious financial harm suffered by Maysaroh and her family by continuing to not pay Maysaroh.

146.     Defendant Ahmad Atassi knowingly benefitted from, or operated in reckless disregard of, the fact that Maysaroh's labor was obtained through forced and coercive means discussed above, when he regularly assigned Maysaroh tasks to perform for Zenobia Lounge, a restaurant he assists in managing.

147.    As a direct and proximate result of the actions of all the Defendants, Maysaroh

suffered severe emotional distress, physical injuries, and economic losses.

148.    Maysaroh is therefore entitled to recover damages in an amount to be proven at

trial, including attorneys' fees and other relief that the Court may deem proper.

### THIRD CLAIM FOR RELIEF

**Unlawful Conduct with Respect to Documents in Furtherance of Trafficking, Peonage, Slavery, Involuntary Servitude, or Forced Labor in Violation of 18 U.S.C. § 1592 (Against Defendants Farah Atassi and Charif Khanji)**

149.    Maysaroh re-alleges and incorporates by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

150.    Defendants Farah Atassi and Charif Khanji removed, confiscated, concealed and

possessed Maysaroh's passport, U.S. visa, Indonesian identity card, and personal address

book upon her arrival in this country. Defendants Farah Atassi and Charif Khanji

removed, confiscated, concealed, and possessed Maysaroh's passport and other

important, personal documents of Maysaroh in order to prevent or restrict Maysaroh's

liberty to move or travel for the purpose of holding her in involuntary servitude, and

subjecting her to forced labor, in violation of 18 U.S.C. § 1592. Maysaroh is permitted to

bring a civil cause of action under 18 U.S.C. § 1595.

151.    As a direct and proximate result of the actions of the Defendants, Maysaroh

suffered severe emotional distress, physical injuries, and economic losses.

152.    Maysaroh is therefore entitled to recover damages in an amount to be proven at

trial, including attorneys' fees and other relief that the Court may deem proper.

## FOURTH CLAIM FOR RELIEF

### Failure to Pay Minimum Wages and/or Overtime Wages Under the
### Fair Labor Standards Act
### (Against All Defendants)

153.     Maysaroh hereby incorporates the preceding paragraphs as if fully stated herein.

154.     Maysaroh is an "employee" within the meaning of the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 203 (e)(1).

155.     Maysaroh is a "non-exempt" employee within the meaning of the FLSA, 29

U.S.C. § 213.

156.     The FLSA requires that employers pay non-exempt employees a minimum wage

equal to an amount set by Congress, which is currently $7.25 per hour.  29 U.S.C. 206

§ (a)(1).

157.     The FLSA requires that employers pay non-exempt employees one and one-half

times their regular hourly rate for hours worked in excess of 40 hours in any one work

week, pursuant to 29 U.S.C. § 207(a)(1).

158.     Defendants knowingly and willfully violated the FLSA when they failed to pay

Maysaroh the minimum wage pursuant to 29 U.S.C. § 206 (a)(1) and/or pay Maysaroh

for overtime hours at the rate of one and one-half times her regularly hourly rate for hours

worked in excess of 40 hours in any one work week, pursuant to 29 U.S.C. § 207(a)(1).

159.     Defendants' actions in violation of 29 U.S.C. §§ 206 and 207 were willful.

160.     Defendants are liable to Maysaroh under 29 U.S.C. §§ 206, 207 and 216 of the

FLSA, for her unpaid minimum wage and overtime compensation, plus an equal amount

as liquidated damages, court costs, reasonable attorneys' fees and expenses, and any

other relief deemed appropriate by the Court.

## FIFTH CLAIM FOR RELIEF

### Failure to Pay Minimum Wages and/or Overtime Wages Under the
### District of Columbia Minimum Wage Act
### (Against All Defendants)

161.    Maysaroh hereby incorporates the preceding paragraphs as if fully stated herein.

162.    Maysaroh is an "employee" within the meaning of the D.C. Minimum Wage Act,

D.C. Code § 32-1002(2).

163.    Maysaroh is a "non-exempt" employee within the meaning of D.C. Code § 32-

1004.

164.    Defendants are "employers" within the meaning of D.C. Code § 32-1002(3).

165.    D.C. Code § 32-1002(a) requires that employers pay non-exempt employees the

federal minimum wage pursuant to the FLSA, plus one dollar ($1.00), which equals

$8.25 per hour.

166.    Defendants violated D.C. Code § 32-1003(a) by failing to pay Maysaroh the

minimum wage required by D.C. Code § 32-1003(a).

167.    D.C. Code § 32-1003(c) requires employers to pay employees at the rate of one

and one-half times their regular hourly rate for hours worked in excess of 40 hours in any

one work week.

168.    Defendants violated D.C. Code § 32-1003(c) by failing to pay Maysaroh at the

rate of one and one-half times her regular hourly rate for hours worked in excess of 40

hours in any one work week.

169.    Defendants' actions in violation of D.C. Code § 32-1003(a) and § 32-1003(c)

were willful.

170.     Defendants are liable to Maysaroh under D.C. Code §§ 32-1003(a), 32-1003(c), and 32-1012(a) and (c) for her unpaid minimum wage and overtime compensation, plus an equal amount as liquidated damages, court costs, reasonable attorneys' fees and expenses, and any other relief deemed appropriate by the Court.

### SIXTH CLAIM FOR RELIEF

**False Imprisonment**
**(Against All Defendants)**

171.     Maysaroh hereby incorporates the preceding paragraphs as if fully stated herein.

172.     Defendants are liable to Maysaroh for false imprisonment.

173.     A defendant has committed false imprisonment where he or she unlawfully detains an individual.

174.     Unlawful detention means depriving an individual of the ability to freely move for any amount of time, either by real force or the threat of force.

175.     Defendants' actions, including seizing Maysaroh' passport and other personal papers, not allowing her to leave Defendants' home unaccompanied, not paying her wages Defendant owed her, thus ensuring she had no financial resources, and otherwise prohibiting her from moving freely, resulted in Maysaroh being unlawfully detained in Defendants' home.

176.     Defendants' actions restraining Maysaroh's liberty and movement were without legal justification.

177.      Defendants detained Maysaroh from June 2011 to January 2012.

178.     Defendants' imprisonment of Maysaroh was intentional.

179.     Defendants' actions were wanton, reckless or in willful disregard of the Maysaroh's legal rights, and were motivated by evil motive or actual malice.

**PRAYER FOR RELIEF**

180.     WHEREFORE, Maysaroh respectfully prays that this Court enter judgment

against all Defendants, jointly and severally, in Maysaroh's favor on all counts, and grant

the following relief:

  a.  Award Maysaroh damages in an amount to be calculated at trial including but not

limited to the full amount of Maysaroh's loss for Defendants' violation of federal

laws including: trafficking with respect to peonage, slavery, involuntary servitude

or forced labor in violation of 18 U.S.C § 1590; forced labor in violation of 18

U.S.C. § 1589; and unlawful conduct with respect to documents in furtherance of

trafficking, peonage, slavery, involuntary servitude, or forced labor in violation of

18 U.S.C. § 1592;

  b.  Award Maysaroh her unpaid minimum wages, plus liquidated damages, pursuant

to 29 U.S.C. §§ 206 and 216;

  c.  Award Maysaroh her unpaid overtime wages, plus liquidates damages, pursuant

to 29 U.S.C. §§ 207 and 216;

  d.  Award Maysaroh her unpaid minimum wages, plus liquidated damages, pursuant

to D.C. Code §§ 32-1003(a) and 32-1012;

  e.  Award Maysaroh her unpaid overtime wages, plus liquidated damages, pursuant

to D.C. Code §§ 32-1003(c) and 32-1012.

  f.  Award to Maysaroh her costs and attorneys' fees incurred in this action, as

provided for by 29 U.S.C. §216(b) and D.C. Code § 32-1012(c);

  g.  Award to Maysaroh compensation for mental suffering and other damages caused

by the imprisonment;

h. Award Maysaroh punitive damages because Defendants acted with evil motive, actual malice, deliberate violence or oppression, intent to injure or willful disregard for Maysaroh's rights, and because Defendants' conduct was outrageous, grossly fraudulent and/or reckless towards the safety of Maysaroh.

i. Any additional relief the Court deems just.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

Respectfully submitted,

*Daniel A Katz*

Daniel A. Katz, Esq., Bar No. 447412
Helen Dalphonse, Esq.*
The Law Offices of Gary M. Gilbert & Associates, P.C.
1100 Wayne Avenue, Suite 900
Silver Spring, MD 20910
Tel:    (301) 608-0880; Fax: (301) 608-0881
Email: dkatz@ggilbertlaw.com

Agatha Schmaedick, Esq.*
Asian Pacific American Legal Resource Center
1012 14th Street, NW Suite 450
Washington, DC 20005
Tel: (202) 706-7135; Fax: (202) 315-0375

*Pro hac vice* application to be submitted